## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| MARGARET GRAVES,<br>individually, and on behalf of all others<br>similarly situated,<br><br>       *Plaintiffs,*<br><br><br>  vs.<br><br>AMERICAN FAMILY MUTUAL<br>INSURANCE COMPANY,<br><br>       *Defendant.* | Case No. 14-2417-EFM-JPO |

### MEMORANDUM AND ORDER

Plaintiff Margaret Graves filed this suit for herself and all similarly-situated policyholders against Defendant American Family Mutual Insurance Company ("American Family"). Graves alleges that American Family violated the terms of her homeowners insurance policy and Kansas law by depreciating labor costs to arrive at the actual cash value owed to her for hail damage to her roof and water damage to her kitchen ceiling. Before the Court is American Family's Motion for Summary Judgment (Doc. 10). American Family argues that it properly determined the actual cash value of Graves's claim by depreciating labor costs according to the insurance policy language and thus Kansas law. For the reasons discussed below, the Court agrees and grants summary judgment.

# I.  Factual and Procedural Background[1]

Prior to this suit, Graves owned a homeowners insurance policy managed by American Family.  On May 28, 2013 a storm caused damage to Graves's roof and kitchen ceiling.  Early in October 2013, Graves made a claim to American Family for the damage.  On certain conditions, Graves's policy reimburses the policyholder for the replacement cost of damaged property.  But if the policyholder does not completely repair or replace the damaged property, the policy provides that American Family "will pay the actual cash value at the time of loss of that part of the building damaged up to the limit applying to the building, but not exceeding the replacement cost of the damaged building."[2]  Graves's policy defines "actual cash value" as "[t]he amount which it would cost to repair or replace damaged property with property of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence."[3]

Later in October, Darren Meyer, a Property Claim Field Senior Adjuster employed by American Family, met Graves at her home and observed the storm damage.  On October 15, 2013, Mr. Meyer sent Graves an estimate for the replacement cost of the damaged property.  Based on that assessment and the terms of Graves's policy, American Family paid Graves a total of $4,010.27, representing the actual cash value of her loss.  In determining the actual cash value payment, American Family depreciated both the costs of materials and labor.  Mr. Meyer also sent Graves a letter providing additional information about the claims process.  The letter explained that to claim replacement coverage, Graves must: (1) notify American Family within

---

[1] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

[2] Graves's Homeowners Policy, Doc. 11-2, p. 11.

[3] Graves's Homeowners Policy, Doc. 11-2, p. 20.

180 days after the loss of her decision to replace and (2) within one year of the loss, she must actually replace the damaged property and provide to American Family all invoices and receipts. If she failed either to timely make a claim for replacement coverage or to complete repair work, she is unable to recover any loss value amount above the actual cash value payment.

On May 12, 2014, Graves informed American Family, through its agent, of the completion and total cost of roof repairs. Graves provided receipts and proof of actual repair. On receiving the receipts and proof of actual repair to Graves's roof, American Family paid Graves a replacement coverage amount. The payment roughly equaled the amount that it initially depreciated from the roof repair estimate to determine her actual cash value payment. After combining the actual cash value payment, deferred payment upon proof of repair, and subtracting the $1,000 policy deductible, Graves received a total $7,354.31.

Though she repaired her roof, Graves was unable to secure ceiling repairs within one year of the storm. Accordingly, she lost any right to claim replacement costs for the loss associated with her ceiling and recovered only the actual cash value for the ceiling damage.

On June 25, 2014, Graves filed a class-action complaint in state court seeking damages and an order declaring unlawful American Family's practice of depreciating the cost of labor in determining actual cash value. On August 22, 2014, American Family removed the action. On October 9, 2014, American Family moved for summary judgment.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[4]

---

[4] Fed. R. Civ. P. 56(c).

A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[5]  The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[6]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[7]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[8]  The court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[9]

## III.   Analysis

American Family argues that it is entitled to summary judgment because it properly calculated the interim payment amount for Graves's policy claim using the property's actual cash value prior to completion of repairs or replacement of the damaged property.  American Family contends that, consistent with Kansas law and the Kansas Insurance Department's recommendation, Graves's policy language allows the depreciation of labor costs in determining actual cash value.[10]  American Family further argues that no court has disallowed depreciation within insurance policies that define "actual cash value" similar to the definition found in

---

[5] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[8] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[10] The Kansas Insurance Department ("KID") defines "actual cash value" as "[t]he amount which it would cost to repair or replace damaged property with material of like kind and quality, less allowance for physical deterioration and depreciation."  KID Bullentin 1983-19, Doc. 15-4, p. 2.

Graves's policy.  Graves responds that the policy language only allows depreciation concerning items that can be subject to physical deterioration; labor, Graves explains, is not subject to physical deterioration and therefore cannot be depreciated.

No Kansas court has addressed the specific issue of this case—whether an insurer may depreciate the cost of labor when calculating the actual cash value for a covered partial loss, where the policy's definition of "actual cash value" specifically provides for depreciation.  But this Court is not altogether left without guidance from Kansas precedent.  Kansas law explains that this Court ought to look to the policy language and consider whether a reasonable insured would understand its provisions to authorize the insurer's actions.[11]  When examining insurance policies, the court must construe the policy to ascertain the parties' intent.[12]  Generally, the court must consider that the purpose of an insurance contract is to indemnify the insured against loss.[13]  But in discerning the parties' specific intent, the court must determine what a reasonable person in the insured's position would understand the language to mean.[14]  If that language is unambiguous, it must be taken in its plain, ordinary, and popular sense,[15] without consideration of extrinsic evidence.[16]  Terms will be deemed ambiguous only through a "natural and

---

[11] *See Thomas v. Am. Family Mut. Ins. Co.*, 233 Kan. 775, 778, 666 P.2d 676, 679 (1983) (considering whether "a reasonable person in the same predicament as [the insured] would . . . expect depreciation to be considered to reduce and impair his ability to repair his partially damaged dwelling").

[12] *Am. Media, Inc. v. Home Indem. Co.*, 232 Kan. 737, 740, 658 P.2d 1015, 1018 (1983) (citing *Goforth v. Franklin Life Ins. Co.*, 202 Kan. 413, 417, 449 P.2d 477, 481 (1969)).

[13] *Thomas*, 233 Kan. at 778, 666 P.2d at 679 (citing *Sperling v. Liberty Mut. Ins. Co.*, 281 So.2d 297, 298 (Fla. 1973)).

[14] *Francher v. Carson-Campbell, Inc.*, 216 Kan. 141, 145-46, 530 P.2d 1225, 1229 (1975).

[15] *Am. Media, Inc.*, 232 Kan. at 740, 658 P.2d at 1018 (citing *Bramlett v. State Farm Mut. Ins. Co.*, 205 Kan. 128, 130, 468 P.2d 157, 159 (1970)).

[16] *Youell v. Grimes*, 217 F. Supp. 2d 1167, 1173 (D. Kan. 2002) (citing *Clark v. Wallace Cnty. Coop. Equity Exch.*, 26 Kan. App. 2d 463, 465, 986 P.2d 391, 393 (1999)).

reasonable interpretation of [the provision's] language."[17]  If that interpretation suggests ambiguity—that the policy's terms either conflict or are susceptible to multiple constructions— "the construction most favorable to the insured must prevail."[18]

Both parties argue that a reasonable interpretation of the policy's terms support their position.  American Family argues that the definition of "actual cash value" clearly anticipates that it will depreciate labor costs as part of "the cost to repair or replace damaged property." American Family also notes that the Kansas Insurance Department endorses this interpretation. Graves responds that, under her policy, "actual cash value" allows depreciation only for tangible items susceptible to "physical deterioration and depreciation" and not intangible services, like labor.  The fact that the parties provide opposing interpretations of the policy and argue that their interpretation alone is reasonable does not necessarily make it so and, more to the point, make the policy language ambiguous.  A court is not obligated to accept a party's legal conclusion; here, the Court is not bound by either party's position on whether a particular reading of the policy is reasonable.[19]

Under the rules of construction for insurance contracts, this Court believes that a reasonable person in Graves's position would expect American Family to depreciate all costs necessary to (re)creating the insured "property"—including the costs associated with labor— when calculating actual cash value.  Again, the policy defines "actual cash value" as "the amount

---

[17] *Am. Media, Inc.*, 232 Kan. at 740, 658 P.2d at 1019 (citing *Clark v. Prudential Ins. Co.*, 204 Kan. 487, 491, 464 P.2d 253, 256 (1970) (internal citations omitted)).

[18] *Id.* (citing *Goforth*, 202 Kan. at 417, 449 P.2d at 1018).

[19] *See Am. Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1059, 179 P.3d 1104, 1110 (2008) ("Whether a written instrument is ambiguous is a question of law to be decided by the courts."); *Payless Shoesource, Inc. v. Travelers Companies, Inc.*, 569 F. Supp. 2d 1189, 1195 (D. Kan. 2008) ("the Court's decision rests on an interpretation of a written insurance contract; a question of law").

which it would cost to repair or replace damaged property of like kind and quality less allowance for physical deterioration and depreciation, including obsolescence."[20]   It is clear that the parties intended this policy to obligate American Family to compensate Graves for damage to her insured property.   It is clear that, absent a proper claim for replacement coverage, the amount of that compensation equals the actual cash value of the insured property at the time of loss.   It is clear that the definition of "actual cash value" generally allows depreciation.   And, thus, it is clear that the actual cash value amount that American Family must initially pay Graves is clearly less than the actual cost to repair or replace; it is a value reduced by any physical deterioration or general depreciation to the insured property.

The key word, which neither party emphasizes, however, is "property."   Though comprised of tangible (materials) and intangible (labor) inputs, property is ordinarily understood as an indivisible output.   And it is that indivisible output, not its original tangible and intangible components, that is the object of this policy.   True, that indivisible output is itself tangible and can lose its useful form over time.   But it is a concern for the value of that useful, ultimate tangible form that the policy contemplates.   And to compensate the insured for any loss of that useful, ultimate form (to restore the "property" to its pre-loss, useful condition), the insurer must measure that loss.   In measuring that loss, the policy does not direct, as Graves would have it, that only the value of tangible inputs be depreciated because only the value of those inputs diminishes with time.   The value of the finished product diminishes.   And that loss is measured by determining the expense of recreating the property (including the costs of its tangible and intangible inputs) and offsetting through depreciation those expenses to approximate the value of

---

[20] Graves's Homeowners Policy, Doc. 11-2, p. 20.

the property's pre-loss, useful condition.  Through this process, the insured is placed in a position as good, but no better, than s/he occupied prior to the damage.  A reasonable insured would understand that the policy allows depreciation of all costs associated with (re)creating the insured property in order to compensate the insured at—and not above—the property's pre-loss value.

To explain this uncomfortably abstract notion, consider the purchase of a new car.  When a consumer purchases a brand new car only to find that the car lost its purchase value the moment that the consumer drove it off the lot, do we say that only the material cost of the car has been depreciated?  No.  As that car is driven further from its ancestral lot, do we then say that its material-value is diminished but its labor-value remains undiminished?  Again, no.  We merely say that the car's value depreciated, without distinction.  And, on arranging a trade-in of his old car, can the consumer then reasonably demand that the dealership credit him a trade-in price that equals the depreciated value of the car's materials plus the full value of the labor originally necessary to produce the car?  Absolutely not.  In its final, usable form, we consider the car *a single unit* of finite value.  We disregard the separate value of all of its component materials and labor, and we simply say that the aggregate product's value depreciated.

Graves's policy covers her home and its components, including her ceiling and roof.  Just like a car (or, more appropriately, a car's hood pad or roof), a home's roof is a single unit.  A roof is the product of combining certain materials and labor.  Each of those materials and labor has independent monetary and use-based value.  But each is valuable to the homeowner only once combined.  Without the labor necessary to place the shingles on the roof, the shingles dawdle in a pile and cannot protect the home.  Graves's policy protects the value of her home and the function of its components, like the roof, against loss.  She is entitled to the approximate value of that property at the time of damage or, under certain circumstances, the actual amount it costs to

replace the damaged property.  Graves partially lost the value of her roof.  She now interprets her policy to entitle her to the value not of her old roof at the time of damage, but to the value of an improved roof less depreciation against only the cost of new materials.  Such a view would allow Graves to recover the ultimate benefit of a new roof that protects her home for the bargain price of a pile of old shingles.

Graves's view, moreover, confuses the actual value of her damaged property with its replacement value.  She anticipates recovering replacement value where the policy does not.  If Graves wants to recover the costs to actually repair her roof, she may do so under the policy. What the policy does not permit, however, is exactly what she seeks—to recover the cost of labor associated with repairing her damaged roof before she actually incurs those costs and properly claims replacement coverage.  The Court does not believe a reasonable insured would expect the policy to intend that "actual cash value" equal the depreciated value of the insured property *plus* new replacement labor costs.

And so Graves's reliance on the dissent in *Redcorn v. State Farm Fire & Casualty Company* earns her position no support.[21]  Graves repeats the dissent's position that a roof is not a single, integrated product, "but a combination of a product (shingles) and a service (labor to install the shingles)."[22]   In the dissent's view, a roof does not amount to a "preassembled consumer good" and thus the question becomes whether each roof component is logically depreciable.[23]  Labor, according to the dissent, is not logically depreciable.  That a minority of the Oklahoma Supreme Court does not consider a roof a preassembled good does not show that

---

[21] 55 P.3d 1017 (Okla. 2002).

[22] *Id.* at 1022.

[23] *Id.*

in this case, the parties' policy regarded Graves's ceiling and roof as such.  Like the majority in *Redcorn*, this Court rejects the dissent's myopic focus on the unintegrated components of the insured property.   An assembled roof is a product and treating that product as a fiction only overlooks the policyholder's real concern that s/he be indemnified against losing the value of a functioning roof.  When Graves purchased her homeowner's insurance policy, she was not separately insuring the materials and labor involved, but uniformly insuring the roof.  As the Oklahoma Supreme Court majority explained of Redcorn, Graves "insured a roof surface, not two components, material and labor.  [Sh]e did  not pay for a hybrid policy of actual cash value for roofing materials and replacement costs for labor.  To construe the policy in such a manner would unjustly enrich the policy holder."[24]

Graves further cites Kansas Insurance Commissioner Order 3673-SO, which ruled that depreciation of labor costs for debris removal contradicted the precedent established in *Thomas v. American Family Mutual Insurance Company*.[25]  While the Kansas Supreme Court's decision in *Thomas* does bind the Court, the administrative adjudication's interpretation of *Thomas* commands no automatic deference.[26]  The ruling is also unpersuasive.  The Insurance Commissioner considered a debris removal provision that is not challenged here.  That provision's language, moreover, materially differs from Graves's disputed policy language.  The debris removal provision that the Commissioner considered lacked any express allowance for depreciation.[27]  Graves's policy, conversely, expressly allows for depreciation in calculating the

---

[24] *Id.* at 1021.

[25] Kansas Insurance Commissioner Order 3673-SO, Doc. 15-3, p. 4.

[26] *See* K.S.A. § 77-415(b)(2).

[27] *See* Kansas Insurance Commissioner Order 3673-SO, Doc. 15-3, p. 2.

actual cash value for a partial loss.  The specific allowance of depreciation greatly alters the coverage that a reasonable insured would expect such a policy to provide.  Thus, this Court is not persuaded by Graves's contention that the Commissioner's reasoning or supporting authority apply with equal force to her "actual cash value" provision.  Finally, the Order never discusses the depreciation of labor generally.  Accordingly, Graves's broad interpretation of the Kansas Insurance Commissioner's Order does not assist this Court's obligation to decide the issue of depreciation of labor costs in determining actual cash value.

Finally, Graves cites *Thomas* as direct support for the proposition that because depreciation is the exception, not the general rule, policy language must explicitly authorize depreciation before the insurer may consider it to reduce an insured's coverage for loss to insured property.[28]  Even accepting that *Thomas* endorses such an exception, the Court considers the exception met.  Graves's policy defines "actual cash value," and that definition provides an "allowance for physical deterioration and depreciation, including obsolescence."[29]  The policy in *Thomas* neither defined "actual cash value," nor provided elsewhere the same allowance for depreciation.[30]  The language of Graves's policy thus distinguishes her policy from the policy considered and the outcome ultimately reached in *Thomas*.  Further, as previously explained, the Court interprets "property" in Graves's case to regard her roof (and ceiling, respectively,) as one combined unit that is subject to the "physical deterioration and depreciation" contemplated by the definition of "actual cash value" in her policy.  Because the explicit language in Graves's

---

[28] *See Thomas*, 233 Kan. at 778, 666 P.2d at 679.

[29] Graves's Homeowners Policy, Doc. 11-2, p. 20.

[30] *See Thomas*, 233 Kan. at 776, 666 P.2d 677 ("Nowhere in the policy does it provide that the cost of repair is to be reduced by a depreciation factor . . .[;] the policy does not define 'actual cash value' ").

policy allows for depreciation in determining actual cash value, *Thomas*'s specific holding must remain limited, as the Kansas Supreme Court intended, to "the insurance policy and facts in [that] case."[31]

      **IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 10) is **GRANTED**.

      **IT IS SO ORDERED.**

      Dated this 22nd day of July, 2015.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[31] *Id.* at 778–79, 666 P.2d at 679 ("the term 'actual cash value,' when applied to a partial loss under the *insurance policy and facts in this case*, means the cost to repair without any reduction for depreciation") (emphasis added).